1

2

3

4

5

6

7

8

9                          IN THE UNITED STATES DISTRICT COURT

10                       FOR THE EASTERN DISTRICT OF CALIFORNIA

11   JOSHUA MARK GILMORE,

12              Petitioner,                    No. CIV S-04-2395 GEB KJM P

13        vs.

14   MATTHEW CATE,[1]

15              Respondent.                    ORDER

16   _____/

17              Petitioner is a California prisoner proceeding with an application for writ of

18   habeas corpus under 28 U.S.C. § 2254.  He challenges two 2006 Sacramento County convictions

19   for attempted murder.  He is serving consecutive terms of life imprisonment with the possibility

20   of parole along with a term of seven years.

21   /////

22   /////

23   /////

24   /////

25   _____

26        [1] Secretary Cate is substituted as the respondent in this case under Federal Rule of Civil
     Procedure 25(d).

1

I. <u>Background</u>

On direct appeal, the California Court of Appeal summarized the facts presented at petitioner's trial as follows:

> In November 1997, Clint and Alice Durkee were living in a duplex in Sacramento with defendant Gilmore. Gilmore was a member of the Church of the Creator (CC). Living nearby were other CC members and members of a related group called the Western Hammerskins. The CC and the Western Hammerskins are both "Skinhead" gangs, i.e., racist organizations promoting White supremacy and hatred of Jews and nonwhites. These gangs liked to go "mobbing" which meant going out looking for fights. The White Supremacist Skinheads were rivals with, and held great animosity towards, an anti-racist Skinhead gang called the Skinheads Against Racial Prejudice, or SHARP.

> *The Almon Incident*

> On July 3, 1997, 16-year-old Jeffrey Almon left his house to visit a friend, when he was approached by Gilmore and Richard Molinare. Desiring to avoid them, Almon walked across the street, but the two men pursued him in a "jalopy" type car, where they confronted him in a parking lot.

> One of the men got out of the car and said to Almon, "What are you running from, are you a SHARP?" Familiar with SHARPs and Skinheads, Almon answered "No, I'm not a SHARP, I'm a human being." The man then replied, "Well, then, why do you look like one?" At that point, the two men assaulted him.

> One of the men held Almon's arms while the other repeatedly punched him in the chest, stomach, and face. Almon then fell to the ground, and felt a "tremendous blow to the back of my skull." He was kicked repeatedly until he lost consciousness. As a result of the attack, Almon lapsed into a coma, suffered severe brain injury, and incurred substantial damage to his face and neck. He was unable to walk unassisted, had total short-term memory loss, and suffered impaired ability to communicate.

> In May of 2000, Almon selected Molinare's photo from a lineup card, but he could not identify Gilmore. However, at the preliminary hearing in this case, Almon positively identified Gilmore as the other attacker.

> Molinare testified for the prosecution as part of a plea agreement regarding this case and other pending charges. Admitting his own involvement in Almon's beating, he testified that Gilmore participated with him, kicking the victim several times in the head, throat and torso.

Alice Durkee testified that on the day of the Almon beating, her husband Clint informed her that Gilmore and Molinare had just beaten someone up.  He directed her to a church parking lot, where they discovered Almon lying motionless on the ground.  Durkee's husband called 911 from a pay phone.  Later that evening, Durkee overheard a conversation among Molinare, Gilmore, and an unidentified third party, describing how Molinare and Gilmore had chased and beat up a suspected member of SHARP, kicking the victim even after he lost consciousness.

Stevanie Coppedge, who knew both Gilmore and the Durkees, testified that Gilmore admitted to her that he had chased and beaten a kid whom he thought was a SHARP member.

*The Cyber Café Incident*

On the evening of November 1, 1997, Skinheads Michael Lee Underwood, Billy Johnson, and Ryan Yourkvitch were hanging around the Cyber Café when they got into a fracas with Joe Bailey, who was acting informally as a security guard, over Yourkvitch's refusal to pick up a cigarette butt he had tossed on the ground.  A week before, a Skinhead had been roughed up by several SHARPs at the café.   During the present encounter, Yourkvitch asked a patron of the café if he was SHARP.  Bailey intervened, telling Yourkvitch this was not the place for politics.

The three Skinhead youths left the café and returned to Melissa Merrill's residence, where they were joined with others, including Gilmore.  Johnson announced that he had been "jumped" by SHARPs at the Cyber Café, which angered the group.  Gilmore said if any of the guys who "started the problem" was still there, one of them was going to die.  The youths piled into three cars and headed for the café.  Gilmore carried a folding knife with a four-inch blade.

After the cigarette encounter, Bailey went to a 7-Eleven store where he bought food and drink with William Harris.  They noticed two cars driving by.  Bailey recognized three of the men in the car as those with whom he had the hostile encounter and told someone to call the police.

As Bailey and Harris headed toward the café, they were approached by a large group of Skinheads emerging from their vehicles.  One of the Skinheads said "who is it?"  Another answered, "That's him" and pointed at Harris.  At that point "all hell broke loose."  Several Skinheads attacked Bailey, while the rest attacked Harris.  Bailey was hit and kicked multiple times.  Harris was hit on the head, and stabbed repeatedly by Gilmore.  Harris's wife began screaming, and the assailants fled.

/////

1
2
3
4

After the attack, witnesses observed Gilmore with a bloody knife in his hand, saying "I shanked that fool 17 times," and "I shouldn't have shanked that motherfucker."  Gilmore was subsequently overheard saying he drove Johnson's car to San Francisco immediately after the Cyber Café attack so he would not be associated with the incident.

5
6

Emergency personnel responding to the scene counted 10 separate stab wounds on Harris's body.  He was hospitalized for five days with a collapsed lung.  At the time of trial, he had more than a dozen knife-wound scars.

7

*Defense*

8
9
10
11
12
13
14

Juliann Cosgrove-Orr, who was at the Cyber Café that night, admitted that she identified Billy Johnson as "the man with the knife" at his preliminary hearing.  However, she also identified Gilmore as one of the five assailants.  Ryan Fleming testified that he saw Johnson hitting the victim Harris with thrusting motions indicative of stabbing, although he could not see a knife in Johnson's hand.  Psychiatrist Martin Blinder testified as to the inherent unreliability of eyewitness testimony.  Addressing a hypothetical containing facts based on the Almon case, Blinder opined that there were several factors which would cause him to question a victim's identification testimony three years after the attack.

15   Resp't's Lodged Doc. No. 1 at 2-4 (footnote omitted).

16   II.  Habeas Relief In General

17          An application for a writ of habeas corpus by a person in custody under a

18   judgment of a state court can be granted only for violations of the Constitution or laws of the

19   United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any

20   claim decided on the merits in state court proceedings unless the state court's adjudication of the

21   claim:

22
23

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

24   /////

25   /////

26   /////

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").[2]   It is the habeas

petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See

Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1)  are

different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to"
> clause if the state court applies a rule different from the governing
> law set forth in our cases, or if it decides a case differently than we
> have done on a set of materially indistinguishable facts.  The court
> may grant relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal principle from
> our decisions but unreasonably applies it to the facts of the
> particular case.  The focus of the latter inquiry is on whether the
> state court's application of clearly established federal law is
> objectively unreasonable, and we stressed in Williams [v. Taylor,
> 529 U.S. 362 (2000)] that an unreasonable application is different
> from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

(2002).

The court will look to the last reasoned state court decision in determining

whether the law applied to a particular claim by the state courts was contrary to the law set forth

in the cases of the United States Supreme Court or whether an unreasonable application of such

law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

---

[2]  Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not
grounds for entitlement to habeas relief.  Fry v. Pliler, 551 U.S. 112, 118-19 (2007).

1  must perform an independent review of the record to ascertain whether the state court decision

2  was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

3  words, the court assumes the state court applied the correct law, and analyzes whether the

4  decision of the state court was based on an objectively unreasonable application of that law.

5  "Clearly established" federal law is that determined by the Supreme Court.

6  Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is appropriate to

7  look to lower federal court decisions as persuasive authority in determining what law has been

8  "clearly established" and the reasonableness of a particular application of that law.  Duhaime v.

9  Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003),

10  overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo, 365 F.3d at

11  782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of Supreme Court

12  precedent is misplaced).

13  III.  Arguments And Analysis

14      A.  Ineffective Assistance Of Counsel

15  Petitioner's first claim is that he was denied his Sixth Amendment right to

16  effective assistance of counsel because his trial counsel failed to move to suppress the in-court

17  identification by Jeffrey Almon of petitioner as one of his attackers.  Am. Pet. at 2-4.

18  The Supreme Court has enunciated the standards for judging ineffective assistance

19  of counsel claims.  See Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must

20  show that, considering all the circumstances, counsel's performance fell below an objective

21  standard of reasonableness.  Id. at 688.  To this end, the petitioner must identify the acts or

22  omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at

23  690.  The court must then determine whether in light of all the circumstances, the identified acts

24  or omissions were outside the wide range of professional competent assistance.  Id.  Second, a

25  petitioner must affirmatively prove prejudice.  Id. at 693.  Prejudice is found where "there is a

26  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.

On direct appeal, the California Court of Appeal, which was the only court to issue a reasoned decision with respect to petitioner's claim, found as follows:

> When first asked to identify his assailants from a police photographic lineup card the victim Almon did not select Gilmore's photo.  During the preliminary hearing in which Gilmore and Molinare were codefendants, Almon immediately identified Molinare as one of the attackers, but failed to identify Gilmore.  However, Almon became emotional while speaking with a police detective in the restroom during a break.  Breaking into tears, he told the detective he was now sure the two codefendants were the ones who savagely beat him.  He repeated this identification in the courtroom.  While conceding the obvious suggestibility in the fact that Gilmore was seated at the defense table in an orange jumpsuit, Almon insisted he was "completely certain" Gilmore was the second assailant.
>
> Almon repeated his identification at trial, explaining the circumstances of his epiphany at the preliminary hearing, and adding that he had "no doubt" Gilmore was the second man who attacked him.
>
> Gilmore now faults his attorney for failing to move to exclude Almon's trial identification on the basis that it was tainted by an impermissibly suggestive pre-trial identification procedure, to wit: Gilmore's presence at the preliminary hearing.  He asserts that there is no tactical explanation for counsel having failed to make such a motion, and that had the motion been made, it would have been meritorious.
>
> "A pretrial identification procedure violates a defendant's due process rights if it is so impermissibly suggestive that it creates a very substantial likelihood of irreparable misidentification.  The defendant bears the burden of proving unfairness as a 'demonstrable reality,' not just speculation. [Citations.]" (*People v. Contreras* (1993) 17 Cal.App.4th 813, 819, 21 Cal.Rptr.2d 496 (*Contreras*); see also *Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253].)  "Merely concluding that the pretrial procedures were suggestive does not end the analysis. . . ." (*Contreras, supra*, at p. 820, 21 Cal.Rptr.2d 496.)  The court must look at the "totality of the circumstances" in assessing whether the pretrial procedure was so unfair as to render the subsequent in-court identification inadmissible.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 989, 108 Cal.Rptr.2d 291, 25 P.3d 519, citing inter alia *Manson v. Brathwaite* (1977) 432 U.S. 98, 104-107 [53 L.Ed.2d 140].)

7

We have not found, nor does Gilmore refer us to, any case in which the pretrial identification procedure claimed to have been unfair was the suggestive appearance of the defendant at a preliminary hearing.  However, the facts of *Contreras* are so strikingly similar, that it may be viewed as dispositive on the issue of whether a motion to exclude Almon's in court identification would have been meritorious.

In *Contreras*, as here, the victim (Lopez) was subjected to a vicious beating by multiple assailants.  While still recuperating from his injuries, Loped failed to identify Contreras from a photographic lineup, or even after having been shown a single photograph of Contreras.  However, at the preliminary hearing, Lopez identified Contreras, who was sitting at the counsel table next to a codefendant, as one of the assailants.  (17 Cal.App.4th at p. 817, 21 Cal.Rptr.2d 496.)

Prior to trial, Contreras made a motion to suppress the victim's identification testimony, contending that the pretrial identification procedures used by the law enforcement (the lineup card and single photo) were impermissibly suggestive.  In denying the motion, the trial court first concluded that Lopez's identification was "highly suspect, but not because of the procedures used by the police."  Instead, the court believed the identification "*was based solely on the fact that both suspects were seated at counsel table*" during the preliminary hearing, and Lopez already knew the codefendant was one of his assailants.  (*Contreras, supra*, 17 Cal.App.4th at p. 819, 21 Cal.Rptr.2d 496, italics added.)  Nevertheless, the court denied the motion ruling that its own doubts about Lopez's veracity were not sufficient to suppress his in-court identification.  It reasoned that the jury should be allowed to consider the identification in the context of the surrounding circumstances.  (*Ibid.*)

The appellate court upheld this ruling, even though it accepted, as supported by substantial evidence, the trial court's opinion that the victim was lying about his ability to identify Contreras. (*Contreras, supra*, 17 Cal.App.4th at p. 823, 21 Cal.Rptr.2d 496.)  Stated the court: "We do not see any unfairness, certainly none offending constitutional standards, in the court's decision to allow the identification evidence.  The jury was made fully aware of the circumstances leading to Lopez's ultimate, in-court identification. The jury heard that Lopez was unable to identify Contreras until seeing him at the preliminary hearing, even though shown pictures of him earlier.  The jury saw the photograph of Contreras and could draw its own conclusions about its clarity.  It could decide whether Lopez should have been able to identify [Contreras] if he indeed had been the assailant."  (*Ibid.*)

The facts of this case are much stronger in favor of permitting the jury to hear Almon's in-court identification than those in *Contreras*.  First, there can be no serious claim that Almon was

8

being untruthful when he identified Gilmore at the preliminary hearing. Had he intended to lie, Almon would not have hesitated to make the identification during the initial part of his direct examination. His turnabout after a bathroom break was spontaneous and bore an aura of verisimilitude.

Second, unlike the victim Lopez, Almon had not been subjected to an arguably biased police procedure (such as a single-person photograph) before making his identification at the preliminary hearing. Finally, Almon's identification of his assailant for the first time at the preliminary hearing was accompanied by a credible explanation–that his memory and vision of events were gradually returning to him after having suffered a traumatic brain injury.

The conclusion is inevitable that any attempt to suppress Almon's in-court identification testimony would have been futile. "The mere fact that a witness is unable to identify a defendant from photographs shown him does not render a subsequent in-court identification inadmissible [Citations.]" (*Contreras*, *supra*, 17 Cal.App.4th at p. 822, 21 Cal.Rptr.2d 496.) Here, despite Almon's initial inability to identify Gilmore and the suggestibility of Gilmore's presence at the preliminary hearing, there were so many factors weighing in favor of the reliability of Almon's identification that the ultimate question was one for the jury to decide, after considering all the surrounding circumstances. Almon's in-court identification testimony was clearly admissible. Accordingly, Gilmore's trial counsel was not ineffective for failing to make the motion.

Resp't's Lodged Doc. No. 1 at 9-11.

Petitioner does not argue that the Court of Appeal used the incorrect federal legal standards in addressing petitioner's ineffective assistance of counsel claim. Rather, petitioner asserts his claim is not barred by 28 U.S.C. § 2254(d) because the Court of Appeal ignored certain facts relative to whether pretrial identification procedures were overly suggestive, namely: 1) the assault on Jeffrey Almon lasted only one minute; 2) Almon did not initially remember being attacked; 3) Almon could not identify petitioner in a photographic lineup; 4) at one point, Almon identified Clint Durkee as one of his assailants rather than petitioner; 5) Almon did not identify petitioner as one of his assailants until over three years had passed since the attack; 6) Almon did not identify petitioner until he was standing next to Molinare in court; 7) Almon was emotional when he identified petitioner; and 8) Almon believed identifying petitioner gave

1   him closure.  Am. Pet. at 17-19.  Assuming all of these facts were before the appellate court,

2   nothing suggests they were not considered.  The court simply did not mention them in the court's

3   opinion which the court was not required to do.  See Miller-El v. Cockrell, 537 U.S. 322, 347

4   (2003) (state court need not make detailed findings addressing all of the evidence before it).

5   Petitioner has not met his burden of showing that he is not precluded by 28 U.S.C. § 2254(d)

6   from obtaining habeas relief as to his ineffective assistance of counsel claim.  Therefore, the

7   claim must be rejected.

8         B.  Guilty Pleas Of Co-Defendants

9               Petitioner asserts the trial court violated his right to a fair trial when the court

10  failed, sua sponte, to instruct jurors that the guilty pleas of witnesses Billy (William) Johnson,

11  Clint Durkee, James Merrill and Richard Molinare acknowledging their part in the two incidents

12  at issue could not be considered as evidence of petitioner's guilt.  Am. Pet. at 5-12.  It does not

13  appear that any California court has issued a reasoned decision with respect to this claim.  On

14  collateral review, the California Supreme Court rejected the claim without comment.  Resp't's

15  Lodged Docs. Nos. 7 & 8.

16              Petitioner fails to point to any Supreme Court authority supporting his argument

17  that his right to a fair trial was violated.  Petitioner is correct that when a co-conspirator or co-

18  defendant does not testify, a violation of the Confrontation Clause of the Sixth Amendment

19  might occur if an out of court statement made by the co-defendant or conspirator is admitted to

20  prove guilt.  See, e.g., Lee v. Illinois, 476 U.S. 530, 546 (1986).  But all of the witnesses

21  petitioner identifies in connection with this claim testified at petitioner's trial.  See RT 489-510,

22  546-673, 844-1043, 1327-1418; RST[3] 25-93.

23              The Ninth Circuit has held that a guilty plea of a testifying co-defendant may not

24  be offered by the government and received over objection as substantive evidence of guilt.

25  _____

26       [3]  RST refers to "Reporter's Supplemental Transcript."

1   United States v. Halbert, 640 F.2d 1000, 1004 (9th Cir. 1981).  However, petitioner did not

2   object to the use of the guilty pleas of Johnson, Durkee, Merrill and Molinare in any manner.

3   See RT 569-570, 844-845, 1396; RST 66-67.  Even if he had objected, he still has not overcome

4   the high hurdle erected by 28 U.S.C. § 2254(d), given the lack of any Supreme Court precedent

5   supporting his claim.

6          C.  Cumulative Error

7                  Finally, petitioner claims he is entitled to relief based on cumulative error.  Am.

8   Pet. at 12.  If more than one error is committed but no single error prejudiced the petitioner

9   enough to warrant habeas relief, a habeas petitioner may be entitled to relief if the cumulative

10  effect of the errors resulted in sufficient prejudice.  Manusco v. Olivarez, 292 F.3d 939, 957 (9th

11  Cir. 2002).  Because petitioner has not established any constitutional errors occurred at his trial,

12  the "cumulative error" basis for relief is not applicable.

13  IV.  Conclusion

14                 For the foregoing reasons, the court will recommend that petitioner's application

15  for writ of habeas corpus be denied.

16                 Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

17  writ of habeas corpus be denied.

18                 These findings and recommendations are submitted to the United States District

19  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

20  days after being served with these findings and recommendations, any party may file written

21  objections with the court and serve a copy on all parties.  Such a document should be captioned

22  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

23  shall be served and filed within ten days after service of the objections.  The parties are advised

24  /////

25  /////

26  /////

that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 8, 2009.

_____
U.S. MAGISTRATE JUDGE

1
gilm2395.157